# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>ISIDRO PULIDO-TEJEDO, and )<br>JOSE MARTIN OROZCO-CUELLAR, )<br>)<br>Defendants. ) | Case No. CR407-037 |

## REPORT AND RECOMMENDATION

Two of the defendants in this case, indicted for conspiring to import and distribute a controlled substance, have moved to suppress evidence obtained upon their seizure and arrest on January 17, 2007. Docs. 48, 73. Defendant Pulido-Tejedo contends that the warrantless stop and search of his vehicle was unlawful because the agents lacked probable cause to arrest him. Doc. 48. Defendant Orozco-Cuellar, in addition to asserting that he was unlawfully seized, contends that his post-arrest statements were the product of a custodial interrogation in violation of his Fifth Amendment rights. Doc. 73. The undisputed facts establish that the agents did not infringe any of defendants' constitutional rights during the arrest and ensuing search.

## I. BACKGROUND

On January 11, 2007, federal agents at the Port of Savannah inspected a twenty-foot container from the Port of Altamira, Mexico which was manifested as containing 135 boxes of "washing powder." Doc. 1.[1] The agents opened some of the boxes and found that many of them contained one kilogram bricks of marijuana. Id. Doc. 1. The agents set up a supervised controlled delivery of the container to a storage warehouse in Atlanta, Georgia. Id. The agents then instructed the management of the warehouse to contact the owner to retrieve the shipment. Id. On January 17, 2007, an unidentified Hispanic male arrived at the warehouse driving a U-Haul truck. After the truck was loaded by warehouse personnel, it was driven to a nearby K-Mart. Id. The driver of the U-Haul walked into the store and was replaced by a new driver, later identified as co-defendant Martin Villegas-Tello. Id.

As the U-Haul left the K-Mart parking lot, agents observed a green Ford Aerostar van driven by a Hispanic male (later identified as

---

[1]The parties have stipulated that, for purposes of deciding the motions to suppress, the facts set forth in the criminal complaint (doc. 1) are correct and that no evidentiary hearing is needed to further develop the events surrounding defendants' arrest. Doc. 73, at 2 n.1; doc. 87, at 2 n.2; doc. 48, at 1, n.1; doc. 88, at 2 n.1; doc. 77, at 1 n.1; doc. 89, at 1.

defendant Pulido-Tejedo) following closely behind the U-Haul as it traveled north on Interstate 85. Id. Agents witnessed the Aerostar change lanes so as to block traffic for the U-Haul. Doc. 73, Ex. 1 (USAO-00024). At approximately 2:55 p.m. the two vehicles left the interstate and stopped at a gas station, where agents observed the driver of a gray Honda Accord (later identified as defendant Orozco-Cuellar) speak briefly with the driver of the U-Haul and the driver of the Aerostar. Id.; doc. 1, at 6. The Honda Accord, followed by the U-Haul truck and the Ford Aerostar, then reentered the interstate and drove in tandem north on I-85. Doc. 1, at 7. Id. Shortly thereafter, police stopped the three vehicles and apprehended each of the drivers. Id.

As developed in the briefs (doc. 87, at 2-3), the following additional facts are undisputed: Defendants were handcuffed, placed in police cars, and transported to a nearby weigh station. Immigration and Customs Enforcement Agent Blankley removed Orozco-Cuellar from the police car and began to walk him to an "outbuilding" for questioning. At this time, the following dialogue took place:

Orozco-Cuellar: The green's not mine, the green's not mine.

Agent Blankley: Green? What green?

3

Orozco-Cuellar: The green.

Agent Blankley: The green? What green? The marijuana?

Orozco-Cuellar: Yes.

Agent Blankley: Whose is it?

Orozco-Cuellar: The young guy told me what was in it.

Doc. 1. As Orozco-Cuellar made the final statement, he pointed at Pulido-Tejedo. Agent Blankley then advised Orozco-Cuellar of his Miranda rights in English and Spanish, and Orozco-Cuellar stopped speaking.

## II. PROBABLE CAUSE

Defendant Pulido-Tejedo argues that since no probable cause existed to justify the stop of his vehicle, his arrest and the subsequent search of his vehicle violated his Fourth Amendment rights under the United States Constitution. Doc. 48. Defendant Orozco-Cuellar contends that the initial seizure of his vehicle was illegal since the agents had no reasonable articulable suspicion that he was engaged in any criminal activity. Doc. 73.

"When the constitutional validity of an arrest is challenged, it is the function of the court to determine whether the facts available to the arresting officers at the moment of the arrest support a finding of probable cause." United States v. Allison, 953 F.2d 1346, 1349-50 (11th Cir. 1992) (citing Beck v. Ohio, 379 U.S. 89 (1964)); see Brinegar v. United States, 338 U.S. 160, 175-76 (1949). Probable cause to effect a warrantless arrest "exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Allison, 953 F.2d at 1350; see also United States v. Diaz-Lizaraza, 981 F.2d 1216, 1222 (11th Cir. 1992); United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992). Probable cause is a "fluid concept" not easily reduced to a neat set of rules. Illinois v. Gates, 462 U.S. 213, 232 (1983). The assessment of probable cause depends on the totality of the circumstances presented in an individual case. Allison, 952 F.2d at 1350.

While probable cause demands more than a mere suspicion, it requires far less than proof beyond a reasonable doubt or even a prima

facie showing of criminal activity. Gates, 462 U.S. at 235 ("'only the probability, and not a prima facie showing of criminal activity is the standard of probable cause'"). Rather, it is simply a "fair probability" or "substantial chance" of criminal activity that is required, "not an actual showing of such activity." Id. at 244 n.13; United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (noting "the implicit requirement of probable cause that a fair probability that evidence of a crime will be found").

Based on the facts available to the officers at the time of the arrest, they had probable cause to believe that Pulido-Tejedo and Orozco-Cuellar were engaged in the commission of a crime. The agents knew that the U-Haul was transporting a large shipment of marijuana and had witnessed the U-Haul travel from the warehouse to a nearby K-Mart parking lot, where the driver disappeared inside the store and was replaced by a new driver. They then observed a van driven by Pulido-Tejedo follow the U-Haul out of the parking lot and drive in tandem with the U-Haul, at times changing lanes to block traffic for it. The agents also witnessed Pulido-Tejedo and the U-Haul driver stop at a gas station, speak with Orozco-Cuellar (the driver of the Honda Accord), and return

to the interstate as a three-vehicle convoy. The officers had actual knowledge that a crime was being committed and, given their observations and knowledge of the "lead car–load car–chase car" technique, they had reasonable grounds to believe that the drivers of the three vehicles were each involved in its commission. They therefore had probable cause to stop and arrest both Pulido-Tejedo and Orozco-Cuellar. See United States v. Najera, 165 Fed. Appx. 700 (10th Cir. 2006) (police who had discovered bags of marijuana hidden in cargo of semi-truck and had arrested those unloading the cargo on a farm, had probable cause to arrest occupant of van who, some 10-15 minutes later, drove in tandem onto the farm with another vehicle driven by an individual implicated in the smuggling operation); United States v. Vital-Padilla, 500 F.2d 641, 644 (9th Cir. 1974) (reasonable belief that two vehicles were traveling together, along with knowledge of the lead car–load car procedure and discovery of illegal aliens in the load car, established probable cause to arrest the driver of the lead car).

Once the agents acquired probable cause to arrest defendants and their companion on drug smuggling charges, they had the right to search each vehicle and its entire contents. The agents reasonably believed that

defendants were drug smugglers whose vehicles likely contained evidence linking them to the marijuana smuggling scheme under investigation. "A warrantless search of a vehicle is permitted if (1) there is probable cause to believe that the vehicle contains contraband, and (2) there are exigent circumstances which necessitate a warrantless search or seizure." United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir. 1990); United States v. Alexander, 835 F.2d 1406, 1408-09 (11th Cir. 1988). "'[T]he mobility of an automobile is exigency enough.'" United States v. Forker, 928 F.2d 365, 369 (11th Cir. 1991) (citation omitted). Furthermore, "[w]hen an occupant of an automobile is the subject of a lawful arrest, the Fourth Amendment permits the arresting officers to contemporaneously conduct a warrantless search not only of the occupant himself, . . . but also of the passenger compartment of the automobile, as well as any closed (or open) containers found in this area of the automobile." United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996); New York v. Belton, 453 U.S. 454, 460 (1981) (announcing a bright-line rule that all areas within the passenger compartment of a vehicle are within the occupant's "immediate control" and therefore may be searched incident to his arrest). Thus any evidence seized from the

vehicles following defendants' arrest was obtained lawfully. Accordingly, defendants' motions to suppress evidence on the ground that they were illegally seized and arrested should be DENIED.

## III. OROZCO-CUELLAR'S STATEMENTS

Defendant Orozco-Cuellar also contends that the statements he made were the result of "custodial interrogation" by Agent Blankley. Doc. 73. Because the agent did not administer <u>Miranda</u> warnings prior to obtaining the statements, defendant argues that his statements must be suppressed as a violation of the Fifth Amendment privilege against self-incrimination. <u>Id.</u>

It is of course well settled that law enforcement officials may not conduct a custodial interrogation of a suspect without first advising him of the rights guaranteed by the Fifth Amendment. <u>Miranda v. Arizona</u>, 384 U.S. 436, 471 (1966). <u>Miranda</u> determined that any custodial interrogation of a suspect involves "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." <u>Id.</u> at 467. The Court therefore created a conclusive presumption that evidence

9

produced by custodial interrogation is coerced unless the suspect is first informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," during any questioning. Id. at 444.

As Orozco-Cuellar was clearly in custody, the only issue is whether his statements were the product of interrogation. The Supreme Court has defined "interrogation" as encompassing "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Miranda, however, was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from "express questioning or its functional equivalent." Id. at 300-301. The protections of Miranda, therefore, do not extend to spontaneous, unprompted statements made to law enforcement officers after a suspect has been taken into custody. Miranda, 384 U.S. at 478; Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous

comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning.").[2]

Furthermore, a number of circuits have held that when a suspect makes an ambiguous spontaneous statement to the police, questions seeking clarification of that statement do not implicate Miranda. See United States v. Howard, 2007 WL 177890, *5 (6th Cir., January 24, 2007) (permissible for officer to ask "What do you mean?" in an attempt to clarify detainee's statement that "All that stuff is mine."); United States v. Gonzalez, 121 F.3d 928, 939-40 (5th Cir. 1997) (permissible for officer to ask if suspect was referring to the cocaine and gun found by the officers when suspect spontaneously stated "all of that is mine"); Andersen v. Thieret, 903 F.2d 526, 532 (7th Cir. 1990) (after arrestee said "I stabbed her", proper for officer to ask "Who?"); Butzkin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (when detainee stated that he had "not been totally honest the day before", proper for officer to inquire what he had not been honest about); United States v. Rhodes, 779 F.2d

---

[2]Defendant concedes that his initial statement, "The green's not mine, the green's not mine," was an unprompted utterance and is therefore admissible.

1019, 1032 (4th Cir. 1985) (proper for officer to ask "Why?" in response to arrestee's statement that officer shouldn't seize spiral notebook). While the Eleventh Circuit has not addressed this question, this Court agrees that where an officer has taken no affirmative steps to elicit a response from a suspect, but merely requests clarification of the suspect's volunteered statement, the request for clarification does not rise to the level of an "interrogation" under Miranda. When Agent Blankley responded to defendant's statement by asking "The green? What green? . . . The marijuana?", he was seeking clarification of Orozco-Cuellar's initial statement that "the green" was not his. Accordingly, defendant's responses to those follow-up questions were not the product of "interrogation" within the meaning of Miranda.

The Court, therefore, rejects defendant's contention that while "'Miranda does not apply to unsolicited, spontaneous and voluntary statements, not made in response to interrogation . . . officers must give warnings before *any* follow-up questioning is resumed.'" Doc. 87, at 5 (citation omitted) (emphasis added).³ While some courts admit answers

---

³"Innis should not be read as a prohibition upon all follow-up questions." 2 Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 6.7(d) (2d ed. 2007).

to all follow-up questions on the theory that the answers are a continuation of the spontaneous statement, according to one treatise "[t]he better view" is that answers to follow-up questions are outside the scope of <u>Miranda</u> "only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made." 2 LaFave and Israel, Criminal Procedure § 6.7(d). Thus, <u>Miranda</u> "interrogation" does occur when police, in response to an arrestee's spontaneous statement, pose "a question which would enhance the defendant's guilt or raise the offense to a higher degree. . . ." <u>Id</u>. Here, after clarifying what defendant meant by "the green," the agent failed to administer the <u>Miranda</u> warnings before asking the additional follow-up question, "Whose [marijuana] is it?" It could be argued that this final question seeks information that exceeds the purpose of clarification and thus falls into the realm of custodial interrogation. But this question did not serve to "enhance" defendant's guilt or raise the offense to a new level, for the defendant had already volunteered that he knew about the marijuana in the U-Haul, and since he had disclaimed any ownership of the drug, it was only natural for the agent to ask whose marijuana it was. The Court views

13

this final question as a further attempt to clarify the defendant's spontaneously volunteered statement rather than as some effort to enhance or amplify defendant's guilt.

## IV. CONCLUSION

Because the agents reasonably believed that defendants Pulido-Tejedo and Orozco-Cuellar were assisting in the smuggling of a large shipment of marijuana, they had probable cause to stop and arrest defendants. The consequent search of their persons and property, therefore, violated none of defendants' rights. The follow-up questions posed to defendant Orozco-Cuellar after his spontaneous statement to the arresting agent were intended to clarify his statement rather than enhance his guilt, and thus those questions did not constitute "interrogation" within the meaning of <u>Miranda</u>. Defendants' motions to suppress (doc. 48, 73) should be DENIED.

**SO REPORTED AND RECOMMENDED** this 18th day of June, 2007.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA